IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MILTON BROWN** | * |
| | * |
| **Plaintiff** | * |
| | * |
| v. | * |
| | *   Civil No.: PJM 10-1002 |
| **NVR, INC., et al.** | * |
| | * |
| **Defendants** | * |

## MEMORANDUM OPINION

Milton Brown has sued Defendants NVR, Inc. ("NVR"), NVR Mortgage Finance, Inc. ("NVR Mortgage"), and Dynamic Capital Mortgage, Inc. ("Dynamic"), alleging breach of contract, negligent misrepresentation, fraud, and violation of three different Maryland statutory provisions. Brown also asserts a single count of rescission against EMC Mortgage Corp. ("EMC"), which has filed a Motion for Judgment on the Pleadings [Paper No. 22]. For the reasons that follow, the Court will **GRANT** EMC's Motion for Judgment on the Pleadings. In addition, the Court will order Brown to **SHOW CAUSE** in writing, within **10 DAYS** of the date of this Opinion, why his claims against Dynamic should not be dismissed, pursuant to Federal Rule of Civil Procedure 4(m), for failure to serve Dynamic with suit papers within 120 days of filing suit.

**I.**

Brown is the owner of a residence in Brookeville, Maryland, a suburb of Washington, D.C. located in northeastern Montgomery County. NVR is the builder of Brown's home. NVR Mortgage, an affiliate of NVR, brokered two mortgages on Brown's property with Dynamic, the original holder of Brown's notes. EMC is the current holder of the mortgages.

In his Amended Complaint, Brown alleges the following facts:[1]

On May 26, 2006, he entered into a contract with NVR for the construction of a residence in Brookeville. The original agreed-upon contract price was $1,635,840. Brown subsequently made earnest money deposits totaling $90,000, leaving $1,545,840 due at closing. However, a provision in the contract provided that, if Brown were to finance the property through an entity other than NVR Mortgage, the total sales price would increase from $1,635,840 to $1,728,990.

Around the time of the execution of the sales contract, Brown obtained a commitment from NVR Mortgage to finance the construction. The commitment—for a ten-year, interest-only note—was *not* contingent upon the sale of Brown's home in Charlottesville, Virginia, where he resided at the time. Prior to obtaining the commitment, Brown explained to NVR Mortgage that he required a loan that would result in payments of approximately $10,000 per month, and NVR Mortgage represented to him that, based on the terms of its commitment, his monthly payments would be close to that figure.

During the course of the construction of the home, Brown agreed to changes in the construction that increased the contract price from $1,635,840 to $1,704,265. Then, in March 2007, as Brown was preparing to close on the property, NVR and NVR Mortgage informed him, without providing an explanation, that the terms of his proposed mortgage had changed and that he would have to pay an additional $100,000 to NVR prior to closing. NVR and NVR Mortgage later retracted the requirement that Brown pay the $100,000, but indicated that, if he chose to obtain financing elsewhere, the price of the property would increase to $2.8 million.

On March 15, 2007, NVR and NVR Mortgage advised Brown that they would not honor their commitment to fund his mortgage on the terms to which the parties had purportedly agreed.

---

[1] At this stage of the litigation, the Court accepts as true all well-pleaded allegations in the Amended Complaint. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In an effort to justify their refusal to honor the agreement, the NVR entities "forced" Brown to sign a document prepared by NVR Mortgage that represented: (1) that NVR Mortgage's original commitment *was* contingent on Brown selling his Charlottesville home; (2) that Brown had not yet sold his Charlottesville home; (3) that Brown's deposit would be forfeited if he could not obtain alternative financing; and (4) that Brown authorized NVR Mortgage to obtain alternative financing on his behalf. According to Brown's allegations, this document was largely false because Brown had in fact sold his home in Charlottesville on September 28, 2006.

On the same day he signed the allegedly false document authorizing NVR Mortgage to seek alternative financing, Brown completed a loan application with NVR Mortgage for a first mortgage in the amount of $1,316,283. In the "assets and liabilities" section of the application, he indicated that the mortgage payments on his Charlottesville home amounted to $2,272 per month. Brown also completed an application for a second mortgage in the amount of $438,761.

The next day, on March 16, 2007, NVR Mortgage completed another loan application on Brown's behalf. On this application, however, NVR Mortgage omitted any mention of the mortgage payments on Brown's Charlottesville home in the application's "assets and liabilities" section.[2] NVR then submitted this application to Dynamic, which agreed to fund both mortgages.

That same day, Brown attended the closing on the mortgages NVR Mortgage had brokered with Dynamic. The purchase and construction price for the property was identified as $1,755,045, meaning that NVR Mortgage had not, despite its promise to the contrary, eliminated all of the additional $100,000 in charges it had attempted to impose on Brown earlier in the

---

[2] Confusingly, Brown appears to allege that he sold his Charlottesville home in September 2006, but that he was still making mortgage payments on that property in March 2007. Indeed, in Count IV of the Amended Complaint, he states that "NVR Mortgage improperly supplied false information to Dynamic Capital by omitting Brown's existing mortgage debt from the assets and liabilities section of the loan application," and that, in so doing, "NVR Mortgage's intention was to have Brown approved for a loan for which he would not otherwise qualify."

month. According to the good faith estimates provided at closing, the terms of the notes brokered by NVR Mortgage and funded by Dynamic included: (1) a five-year adjustable rate first mortgage in the amount of $1,316,283, at an initial interest rate of 7.75 percent, with monthly payments totaling $9,430.01; (2) a second mortgage in the amount of $438,761, at an interest rate of 11.125 percent, with monthly payments totaling $4,067.68; (3) payment of seven points on the second mortgage, totaling $30,713.27; and (4) a credit of only $90,000 in deposits.

When Brown objected to the terms of the mortgages and the overstatement of the purchase price on the home, NVR and NVR Mortgage informed him that, if he chose not to close on the terms stated, he would forfeit his deposit. Not wanting to have this happen, Brown closed on the mortgages with Dynamic. Again, this took place on March 16, 2007. Subsequently, on a date not specified in the Amended Complaint, Dynamic sold both mortgages to EMC.

In March 2010, Brown filed the instant lawsuit in the Circuit Court for Montgomery County, Maryland, suing NVR, NVR Mortgage, and Dynamic for breach of contract, negligent misrepresentation, fraud, and violation of three different Maryland statutory provisions. In addition, Brown has sought to rescind his mortgages with EMC.

EMC removed the case to this Court in April 2010.[3] Six months later, it filed the instant Motion for Judgment on the Pleadings, in which it argues that Brown has failed to allege any facts that would allow for rescission of the mortgages purchased by EMC.

---

[3] The Court has jurisdiction over this lawsuit pursuant to the federal diversity statute. *See* 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . [c]itizens of different States."). Brown is a citizen of Maryland. NVR and NVR Mortgage were incorporated under the laws of, and maintain their principal places of business in, the state of Virginia. EMC is a Delaware corporation that maintains its principal place of business in Texas. Dynamic is a Massachusetts corporation that maintains its principal place of business in Massachusetts.

As of today, more than a year after EMC removed the lawsuit to this Court, Brown has failed, without explanation, to serve Dynamic. The NVR entities have answered the Amended Complaint and, as noted, EMC has filed the instant Motion for Judgment on the Pleadings.

**II.**

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed[,] but early enough not to delay trial." Fed. R. Civ. P 12(c). When considering a motion for judgment on the pleadings, a court applies "the same standard" as for motions made pursuant to Rule 12(b)(6). *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). Thus, when a party moves for judgment on the pleadings pursuant to Rule 12(c), the well-pled factual allegations in the complaint are taken as true, whereas those of the answer are taken as true only to the extent that they have not been denied or do not conflict with those in the complaint. *Pledger v. N.C. Dep't of Health and Human Servs.*, 7 F. Supp. 2d 705, 707 (E.D.N.C. 1998).

The purpose of a Rule 12(c) motion for judgment on the pleadings is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotation marks omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being

made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion for judgment on the pleadings, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and conclusions." *Id.* (internal citations and quotation marks omitted). It is not sufficient that the well-pleaded facts create "the mere possibility of misconduct." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Rather, to withstand a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that, on the facts as pled, the court must be able to draw "the reasonable inference that the defendant is liable for the conduct alleged." *Id.* at 1949 (internal citations and quotation marks omitted).

**III.**

In its Motion for Judgment on the Pleadings, EMC argues that Brown's claim of rescission against it fails to state a claim upon which relief can be granted because: (1) no statutory provision provides Brown with a right of rescission; (2) EMC is a *bona fide* purchaser for value, and thus a holder in due course, of Brown's mortgage notes; and (3) Brown has not pled facts that would entitle him to a right of rescission under Maryland common law. In response, Brown appears to concede that he has no statutory right to rescission of his contract with EMC. He nevertheless argues that his Amended Complaint has set forth facts sufficient to survive a motion for judgment on the pleadings because: (1) EMC's assertion that it is a *bona*

*fide* purchaser for value of Brown's mortgage notes constitutes an affirmative defense and is therefore not appropriate for the Court's consideration at this stage of the litigation; and (2) Brown has pled facts that, if proved true, would entitle him to a right of rescission under Maryland common law.

For the reasons that follow, the Court finds that EMC has the better part of the argument.

**A.**

EMC first argues that no applicable statutory provision provides Brown with a right to rescind his contract with EMC.[4] Because Brown essentially concedes this point, the Court need not discuss it in detail. For present purposes, it suffices to note that the Court agrees with EMC that no statutory provision cited by either of the parties provides Brown with a right to the relief he seeks against EMC.

**B.**

EMC next argues that, even if the NVR entities and/or Dynamic committed fraud in securing the mortgage contract between Brown and Dynamic, EMC, as a *bona fide* purchaser for value of the loans, is a holder in due course of the mortgages and thus retains a valid, non-rescindable lien on Brown's property. *See Wells Fargo Bank, N.A. v. Henson*, 649 F. Supp. 2d 431, 433 n.3 (D. Md. 2009) ("Fraud perpetrated by a third person without the instigation, procurement, knowledge, or consent of the mortgagee, will generally not affect the mortgage or prejudice his security.") (quoting *Wicklein v. Kidd*, 131 A. 780, 783 (Md. 1926)) (internal

---

[4] More specifically, EMC notes that the rescission provisions of the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, do not apply to purchase-money mortgages such as the loans at issue in this case. *See* 15 U.S.C. § 1635(e)(1) ("This section does not apply to . . . a residential mortgage transaction as defined in [15 U.S.C. § 1602(w)]."); 15 U.S.C. § 1602(w) (defining the term "residential mortgage transaction" as "a transaction in which a mortgage . . . is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling."). In addition, EMC notes that neither the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.*, nor any other applicable provision of the Maryland Code, would provide Brown with a right to rescind his contract with EMC.

quotation marks omitted). In response, Brown argues that EMC's assertion of *bona fide* purchaser status is essentially an affirmative defense, and that he therefore has no obligation to allege facts that might negate that defense. *See Fin. Credit Corp. v. Williams*, 229 A.2d 712, 716 (Md. 1967) ("Good faith is a condition precedent to status as a holder in due course. Upon a showing that the title of the original assignor . . . was defective, the burden of proving good faith shifted to the appellant-assignee.").

On this point, the Court agrees with Brown. Plainly, a showing that the defendant is not a holder in due course of a note is not a required element of a claim of rescission under Maryland law. Indeed, the assertion of *bona fide* purchaser status operates, in effect, as an affirmative defense that the defendant holds the burden of establishing. *See Williams*, 229 A.2d at 716. Accordingly, Brown need not allege facts that would negate such a defense in order to survive a motion for judgment on the pleadings. EMC's argument on this point is therefore unavailing.

## C.

EMC next argues that Brown has not pled facts that would entitle him to a right of rescission under Maryland common law. Brown, of course, disagrees. On this critical point, the Court finds EMC's arguments persuasive and concludes that EMC must be dismissed from this lawsuit with prejudice.

Under Maryland common law, a party that seeks to rescind a contract on grounds of mistake, fraud, misrepresentation, duress, or undue influence must restore the *status quo* either by returning or by offering to return whatever it has received under the contract. *See Washington Homes, Inc. v. Interstate Land Dev. Co.*, 382 A.2d 555, 563 (Md. 1978); *see also* 5A Maryland Law Encyclopedia § 130 (2001). "This offer of restoration or tender back must, at a minimum, demonstrate an unconditional willingness to return to the other party both the consideration that

was given by that party and any benefits received under the contract." *Lazorcak v. Feuerstein*, 327 A.2d 477, 481 (Md. 1974). A party seeking rescission must also demonstrate that it acted promptly after discovery of a ground for rescission. *See Merritt v. Craig*, 746 A.2d 923, 927 (Md. Ct. Spec. App. 2000) ("[W]hen a party to a contract discovers a fraud has been perpetrated upon him or her, he or she is put to a prompt election to rescind the contract or to ratify it and claim damages. Acts by a purchaser which constitute acquiescence, ratification or estoppel will preclude him or her from rescinding the contract.").

As EMC notes, the facts alleged in Brown's Amended Complaint contain no indication at all that Brown has endeavored to restore the *status quo* by making an unconditional offer to return to EMC the funds he received pursuant to the mortgage contract. Nor do the facts Brown alleges demonstrate that he acted promptly after discovering the grounds for rescission—namely, the wrongdoing allegedly committed by the NVR entities. Indeed, if anything, the Amended Complaint appears to show that Brown has continued to perform under the mortgage agreement for a period of years, suggesting that "acquiescence, ratification or estoppel [should] preclude him . . . from rescinding the contract." *Merritt*, 746 A.2d at 927.

Brown responds by arguing that he has not yet incurred any obligation to restore the *status quo* because, at this stage of the litigation, there is only a *potentiality* for rescission—as opposed to an actual *justification* for rescission. More specifically, Brown argues that he will become obligated to restore the *status quo*, if at all, only after "the case progresses and depositions are taken," which is when, in his view, the *potentiality* for rescission *may* ripen into an actual *justification* for rescission. In support of this argument, Brown cites *Monumental Life Insurance Company v. U.S. Fidelity and Guaranty Company*, in which the Court of Special Appeals of Maryland held that the obligation to restore the *status quo* arises only after the party

seeking rescission learns of facts that would actually *justify* rescission, as opposed to facts that raise the *mere potentiality* for rescission. 617 A.2d 1163, 1181 (Md. Ct. Spec. App. 1993). The Court concludes that Brown misapprehends the holding of *Monumental Life*.

In that case, Monumental, an insurance company, purchased a $20 million director and officer liability insurance policy from California Union, another insurer. *Id.* at 1168. In 1986, Peoples Security, a third insurance company, sued Monumental and three of its officers for various wrongs arising out of Monumental's aggressive recruitment of Peoples employees. *Id.* at 1166. In 1990, after a federal court ordered that Peoples' claims against Monumental had to be submitted to binding arbitration, an arbitration panel concluded that Monumental had engaged in unfair trade practices, among other wrongs, and awarded Peoples more than $9 million in damages. *Id.* at 1167-68. Subsequently, after California Union refused to indemnify Monumental for expenses incurred as a result of the Peoples litigation, Monumental sued California Union to compel indemnification. *Id.* at 1168-69. In that case, the trial court ruled: (1) that Monumental's director and officer liability policy with California Union was void *ab initio* because, when Monumental applied for the policy, it materially misrepresented in its response to an application question that it was not aware of any facts which might result in a claim which would fall within the proposed insurance; and (2) California Union's attempted rescission, some four years after Peoples commenced its claims against Monumental, was timely. *See id.* at 1170-71.

On appeal, Monumental argued that California Union's efforts to rescind its insurance contract with Monumental were untimely because they were not undertaken until November 1990, more than four years after California Union received a copy of Peoples' complaint against Monumental—in other words, more than four years after California Union became aware that Monumental might have engaged in wrongdoing. *See id.* at 1180. The Court of Special Appeals

disagreed. Specifically, the court held that California Union's receipt of Peoples' complaint against Monumental raised the mere *potentiality* for rescission, and not facts that would *justify* rescission. *See id.* at 1181. The court wrote:

> In the instant case, it is undisputed which facts would actually *justify* rescission, to wit: Cal[ifornia] Union could *justify* rescission of Monumental's [director and officer] policy *only* after it acquired sufficient proof that Monumental, and its officers and directors, had actually engaged in wrongdoing. For its part, Monumental itself spent considerable time, energy and money in the underlying litigation *denying* that it had engaged in any wrongdoing; we therefore find it curious that Monumental now contends that Peoples' U.S. District Court complaint could, of itself, form a sufficient basis for Cal[ifornia] Union to be justified in denying [director and officer] coverage to Monumental. Consequently, the furnishing of Peoples' 1986 complaint to Cal[ifornia] Union could not—in and of itself—supply sufficient grounds to justify Cal[ifornia] Union in rescinding its policy.

*Id.* (emphases in original).

Thus, in *Monumental Life*, the Court of Special Appeals in effect held that the mere filing of a lawsuit by a first party alleging wrongdoing by a second party does not, without more, put a third party—one aware of, but not involved in, the litigation—on notice that it has grounds to justify rescission of a contract it might have with the second party. The court certainly did *not* hold, contrary to Brown's suggestion here, that a party seeking to rescind a contract does not obtain knowledge of facts that might justify rescission until his *own* lawsuit—the very one in which he seeks to compel rescission—proceeds through discovery and develops facts proving the party's entitlement to rescission. Indeed, the rule that Brown urges would effectively eviscerate the common-law rescission doctrine. Instead of a party seeking to rescind a contract having a *pre-litigation* duty to promptly offer to restore the *status quo*, there would be no duty to make the offer until facts justifying rescission were confirmed *during the course of the litigation*.

Brown's failure to allege that he has offered to restore the *status quo* is, in the Court's view, fatal to his claims against EMC. He concedes that he has not offered to return to EMC the funds he received pursuant to the mortgage contract. And, although he admits that he had knowledge of the salient alleged facts underlying his claims against the NVR entities when he consummated the mortgage agreement on March 16, 2007, he has continued to perform under that agreement for a period of years. Whether Brown is entitled to an award of damages for the allegedly fraudulent actions of NVR and/or NVR Mortgage remains to be seen. However, he simply has not pled facts that could plausibly entitle him to a *rescission* of his contract with EMC. Brown was "put to a prompt election to rescind the contract or to ratify it and claim damages," *Merritt*, 746 A.2d at 927, and he chose the latter route. Accordingly, the Court will dismiss the rescission claim against EMC with prejudice and, since that is the only count asserted against EMC, the Court will also dismiss EMC from the suit.

**IV.**

Finally, the Court feels compelled to address the fact that, as of today, some 13 months after this lawsuit was removed to federal court, Brown has not served Dynamic, nor has he provided the Court with any explanation for his failure to do so—despite Federal Rule of Civil Procedure 4(m)'s clear admonition that, absent a showing of good cause, a plaintiff must serve a defendant within 120 days. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff— must dismiss the action without prejudice against that defendant or order that service be made within a specified time."). Consequently, the Court will order Brown to show cause in writing, within 10 days, why his claims against Dynamic should not be dismissed, pursuant to Rule 4(m),

for failure to serve within 120 days. If Brown does not establish a showing of good cause within the stated 10-day period, the Court will dismiss his claims against Dynamic.

**V.**

For the foregoing reasons, EMC's Motion for Judgment on the Pleadings [Paper No. 22] is **GRANTED WITH PREJUDICE**, and EMC is **DISMISSED** from this lawsuit. In addition, Brown shall **SHOW CAUSE** in writing, within **10 DAYS** of the date of this Opinion, why his claims against Dynamic should not be dismissed, pursuant to Federal Rule of Civil Procedure 4(m), for failure to serve Dynamic with suit papers within 120 days of filing suit.

A separate Order will **ISSUE**.

                                                  /s/
                                **PETER J. MESSITTE**
                      **UNITED STATES DISTRICT JUDGE**

**May 31, 2011**